UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
BOWLING GREEN DIVISION
CIVIL ACTION NO. 1:11-CV-00076-TBR

FIRST BANCORP, INC. d/b/a FIRST NATIONAL                    Plaintiff
BANK RUSSELL SPRINGS

v.

UNITED STATES OF AMERICA, *et al.*                          Defendants

## MEMORANDUM OPINION

This matter is before the Court upon Plaintiff First Bancorp, Inc. d/b/a First National Bank Russell Springs (First National) and Defendant United States' competing Motions for Summary Judgment. (Docket Nos. 11 & 12, respectively.)  The United States filed a Response, (Docket No. 15), First National filed a Combined Reply and Response, (Docket No. 18), and the United States filed a Reply, (Docket No. 19).  This matter is now fully briefed and ripe for adjudication.

## BACKGROUND

This case concerns approximately $200,000 that the Internal Revenue Service (IRS) levied from Tantus Tobacco, LLC.  Brian Cooper purchased Tantus Tobacco, along with some real property and interests in several other businesses, from Kenneth Catron in 2008.  Cooper agreed to pay Catron in 36 monthly payments of $18,404.34, plus interest.  These payments are referred to in this litigation as the "Cooper Payments."

First National loaned substantial sums of money to Catron for the purpose of developing and launching a new business.  First National secured the funds it loaned Catron by entering into several security agreements with Catron.  The first of these security agreements was entered into on June 29, 2007 (the "2007 Security Agreement").  That agreement secured "[a]ll present and future debts, even if this Agreement is not referenced, the debts are also secured by other collateral, or the future debt is unrelated to or of a difference type than the current debt."  (Docket No. 11-3.) The 2007 Security Agreement went on:

> SECURITY INTEREST.  To secure the payment and performance of the Secured Debts, Debtor gives Secured Party a security interest in all of the Property described in this agreement that Debtor owns or has sufficient rights in which to transfer an interest, now or in the future, wherever the property is or will be located, and all proceeds and products of the Property. . . .
> PROPERTY DESCRIPTION.   The Property is described as follows:
> ☒ Accounts and Other Rights to Payment:  All rights to payment, whether or not        earned by performance, including, but not limited to, payment for property or        services        sold, leased, rented, licensed, or assigned. . . .
> ☒ Inventory: . . . .
> ☒ Equipment: . . . .
> . . . .
> ☒ Specific Property Description:  The Property includes, but is not limited by, the following  .  .  . :   ALL EQUIPMENT, ACCOUNTS RECEIVABLE AND INVENTORY

(Docket No. 11-3.)  First National filed a financing statement, also on June 29, 2007, with the Kentucky Secretary of State (the "2007 Financing Statement").  That financing statement described the collateral as "ALL EQUIPMENT, ACCOUNTS RECIEVABLE [sic] and INVENTORY."  (Docket No. 11-4, at 2.)

On November 19, 2007, a federal tax lien arose as to Catron in the amount of $69,346.94 for the 2006 tax year (the "2006 Tax Lien"). The IRS filed a notice of federal tax lien in regard to the 2006 Tax Lien on April 14, 2008, in the Russell County Clerk's Office.

On November 7, 2008, Catron entered into an agreement with Cooper and several other entities (the "Cooper Parties"), agreeing to sell the Cooper Parties all of Catron's interest in the Cooper Parties and the businesses they operated. That agreement obligated Cooper to pay Catron the principal amount of $662,556.27, plus interest on the unpaid balance, payable in 36 monthly payments of $18,404.34, plus interests. As noted above, these payments are referred to as the "Cooper Payments."

On March 19, 2009, Catron entered into another security agreement with First National (the "March 2009 Security Agreement"). Much like the 2007 Security Agreement, the March 2009 Security Agreement took a secured interest in Catron's "Accounts and Other Rights to Payment," "Inventory," and "Equipment." (Docket No. 11-7.) The March 2009 Security Agreement differed from the 2007 Security Agreement insofar as the "Specific Property Description" section stated: "ALL INVENTORY, RAW MATERIALS, WORK IN PROGRESS OR MATERIALS USED OR CONSUMED IN DEBTOR'S BUSINESS, WHETHER NOW OWNED OR HEREAFTER ACQUIRED, TOGETHER WITH ALL PROCEEDS INCLUDING ACCOUNTS RECEIVABLE AND NOTES . . . ." (Docket No. 11-7.) First National filed a financing statement on March 24, 2009 (the "March 2009 Financing Statement"), which tracked the "Specific Property Description" language of the March 2009 Security Agreement in describing the collateral. (*See* Docket No. 11-8, at 2.)

On September 14, 2009, a federal tax lien arose as to Catron in the amount of $264,805.91 for the 2007 tax year (the "2007 Tax Lien"). The IRS filed a notice of federal tax lien in regard to the 2007 Tax Lien on October 16, 2009, in the Russell County Clerk's Office.[1]

On November 20, 2009, Catron and First National entered into an "Assignment of Proceeds from Agreement and Release," whereby Catron assigned to First National his interest in the Cooper Payments. (*See* Docket No. 11-10.) Then on November 27, 2009, Catron entered into another security agreement with First National (the "December 2009 Security Agreement"). (*See* Docket No. 11-11.) That agreement took a secured interest in Catron's property as follows: "Accounts and Other Rights to Payment," "Instruments and Chattel Paper," and "General Intangibles," and set forth the "Specific Property Description" as "ASSIGNMENT OF PROCEEDS FROM AGREEMENT AND RELEASE DATED 11-20-2009." (Docket No. 11-11.) First National filed a financing statement on December 11, 2009, which tracked the "Specific Property Description" language of the December 2009 Security Agreement in describing the collateral. (Docket No. 11-12, at 2.)

Beginning in October 2010, the IRS levied a total of nine Cooper Payments, the first eight in the amount of $22,222.22 each and the ninth and final payment in the amount of $14,173.10, for a total amount of $191,950.86. The first four levies, which occurred on October 8, November 19, and December 13, 2010, and January 12, 2011,

---

[1] The United States also references a tax lien as to Catron for the 2008 tax year, for which it filed a notice of federal tax lien on May 3, 2010. (*See* Docket No. 12-1, at 2-3.) This tax lien does not appear to the Court to affect the issues raised in the parties' competing Motions for Summary Judgment and, as such, will not be addressed further here.

initially were applied to the 2006 Tax Lien.  However, Catron filed an amended return on August 20, 2009, and the processing of that return resulted in an abatement of Catron's 2006 federal tax liabilities.  As such, the IRS applied four credits in the amount of the first four levies to Catron's still-outstanding liability under the 2007 Tax Lien.  The final five levies of the Cooper Payments, which occurred on February 14, March 14, April 11, May 11, and June 10, 2011, were applied directly to the 2007 Tax Lien.  Thus, the funds from all nine levied payments ultimately were applied to the 2007 Tax Lien.  The following represents a summary of the timeline of relevant events:

| Date | Event |
| --- | --- |
| June 29, 2007 | First National files 2007 Financing Statement relative to 2007 Security Agreement |
| November 19, 2007 | 2006 Tax Lien arises |
| April 14, 2008 | IRS files notice of 2006 Tax Lien |
| November 7, 2008 | Catron sells business interests and real property in exchange for right to receive the Cooper Payments |
| March 24, 2009 | First National files March 2009 Financing Statement relative to March 2009 Security Agreement |
| September 14, 2009 | 2007 Tax Lien arises |
| October 16, 2009 | IRS files notice of 2007 Tax Lien |
| December 11, 2009 | First National files financing statement relative to December 2009 Security Agreement |
| October 8, 2010 | IRS receives first of nine levied Cooper Payments ($22,222.22) |
| November 19, 2010 | IRS receives second of nine levied Cooper Payments ($22,222.22) |
| December 13, 2010 | IRS receives third of nine levied Cooper Payments ($22,222.22) |
| January 12, 2011 | IRS receives fourth of nine levied Cooper Payments ($22,222.22) |
| January 21, 2011 | 2006 Tax Lien is released |
| February 14, 2011 | IRS receives fifth of nine levied Cooper Payments ($22,222.22) |
| March 14, 2011 | IRS receives sixth of nine levied Cooper Payments ($22,222.22) |
| April 11, 2011 | IRS receives seventh of nine levied Cooper Payments ($22,222.22) |
| May 11, 2011 | IRS receives eighth of nine levied Cooper Payments ($22,222.22) |
| June 10, 2011 | IRS receives ninth and final levied Cooper Payment ($14,173.10) |

STANDARD

Summary judgment is appropriate where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "[N]ot every issue of fact or conflicting inference presents a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir. 1989). The test is whether the party bearing the burden of proof has presented a jury question as to each element in the case. *Hartsel v. Keys*, 87 F.3d 795, 799 (6th Cir. 1996). The plaintiff must present more than a mere scintilla of evidence in support of her position; she must present evidence on which the trier of fact could reasonably find for her. *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). Mere speculation will not suffice to defeat a motion for summary judgment: "[T]he mere existence of a colorable factual dispute will not defeat a properly supported motion for summary judgment. A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate." *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1177 (6th Cir. 1996), *abrogated on other grounds by Lewis v. Humboldt Acquisition Corp., Inc.*, 681 F.3d 312 (6th Cir. 2012).

Much, if not all, of the pertinent facts in this case are undisputed, and the parties seem to agree that the issues of attachment, priority, and the propriety of the IRS's levies of the Cooper Payments are purely questions of law that should be decided on summary judgment.

DISCUSSION

An innocent third party whose property has been confiscated by the IRS to satisfy another party's tax liability may sue for wrongful levy. *See* 26 U.S.C. § 7426(a)(1). In order to prevail on a wrongful levy claim, a claimaint must establish that there was an actual levy on the property, that the claimant has an interest or lien superior to the United States' interest in the property, and that the levy was wrongful. *See id.*

26 U.S.C. § 6321 provides for a federal tax lien in favor of the government against any person who fails to pay federal taxes. This lien attaches to "all property and rights to property, whether real or personal, belonging to such person." *Id.* A federal tax lien arises at the time the assessment is imposed under § 6321. *See id.* § 6322. To be effective as against third parties, notice of the lien must be publicly filed pursuant to state recordation law.

When addressing disputes involving federal tax liens, the questions of whether a property interest exists and the precise nature of that interest are governed by state law, but the question of priority between a federal tax lien and a state-law lien is governed by federal law. *See Aquilino v. United States* 363 U.S. 509, 513–14 (1960); *see also United States v. Craft*, 535 U.S. 274, 278 (2002); *United States v. Dishman Indep. Oil, Inc.*, 46 F.3d 523, 526 (6th Cir. 1995). Unless otherwise specified by statute, "[t]he priority of federal liens vis-à-vis other liens is governed by the principles that first in time is first in right and that tax liens are superior to inchoate liens." *State Bank of Fraser v. United States,* 861 F.2d 954, 963 (6th Cir.1988) (citing *United States v. City of New Britain,* 347 U.S. 81, 85–86 (1954)); *see also Dishman*, 46 F.3d at 526. For purposes of priority relative to a federal tax lien, a state-law lien is inchoate—*i.e.*, is not perfected—unless

and until the identity of the lienor, and the property subject to the lien, and the amount of the lien are established.  *See United States v. McDermott*, 507 U.S. 447, 449 (1993) (citing *City of New Britain,* 347 U.S. at 86); *Dishman*, 46 F.3d at 526.

First National argues that the IRS wrongfully levied each of the nine Cooper Payments because both the 2007 Security Agreement and the March 2009 Security Agreement have priority vis-à-vis the 2007 Tax Lien.[2]  First National also argues that the IRS cannot defeat First National's priority simply by reallocating monies to the 2007 Tax Lien that were levied pursuant to the 2006 Tax Lien.  The United States, on the other hand, insists that both the 2007 Security Agreement and the March 2009 Security Agreement are inferior to the IRS's interests because the 2006 Tax Lien was perfected prior to either of those agreements.  The United States also asserts that neither of those agreements attached to the Cooper Payments.  The United States further argues that both the 2007 Financing Statement and March 2009 Financing Statement failed to perfect an interest in the Cooper Payments.  Finally, the United States maintains that the release of the 2006 Tax Lien does not render improper the levies made pursuant to that

---

[2] First National also argues, in the alternative, that "because the IRS stood in the Catron's shoes with respect to the Cooper Payments and Catron had no right or interest in those payments after assigning them to First National, the IRS could not levy the Cooper Payments."  (Docket No. 11-1, at 7, 12-15.)  First National does not revisit this argument in its Combine Response and Reply.  (*See* Docket No. 18.)  To the extent this argument needs be addressed here, the Court finds that the November 2009 assignment and December 2009 Security Agreement, which were filed after the IRS perfected the 2006 and 2007 Tax Liens, would be junior to the IRS's interest in the Cooper Payments because, even if Catron assigned his rights to the Cooper Payments to First National, he did so subject the 2006 and 2007 Tax Liens.  *See United States v. Bess*, 357 U.S. 51, 57 (1958) ("The transfer of property subsequent to the attachment of the lien does not affect the lien, for 'it is of the very nature and essence of a lien, that no matter into whose hands the property goes, it passes cum onere . . .'" (quoting *Burton v. Smith*, 38 U.S. (13 Pet.) 464, 483 (1839))); *see also United States v. Big Value Supermarkets, Inc.*, 898 F.2d 493, 497 (6th Cir. 1990) (citing *Bess*, 357 U.S. at 57) ("It is settled federal law that transfers subsequent to the attachment of a federal lien do not affect the lien in any way.").  Therefore, and because the Court finds the parties' other arguments dispositive, First National's argument in this regard needs not be addressed further here.

lien or otherwise prevent the IRS from applying those overpayments to Catron's 2007 tax liabilities.

## I.      Attachment and Perfection

Under Kentucky's version of Article 9 of the Uniform Commercial Code (UCC), a security interest attaches to collateral when it becomes enforceable against the debtor with respect to the collateral.   Ky. Rev. Stat. § 355.9-203(1).   A security interest becomes enforceable against the debtor and third parties with respect to the collateral when (1) value has been given, (2) the debtor has rights in the collateral or the power to transfer rights in the collateral to a secured party, and (3) the debtor has authenticated a security agreement that provides a description of the collateral.   *Id.* § 355.9-203(2). Under § 355.9-108(1), "a description of personal or real property is sufficient, whether or not it is specific, if it reasonably identifies what is described." Section 355.9-108(2) goes on, "a description of collateral reasonably identifies the collateral if it identifies the collateral by: . . . category [or] a type of collateral defined in this chapter."   However, "[a] description of collateral as 'all the debtor's assets' or 'all the debtor's personal property'" is insufficient.   *Id.* § 355.9-108(3).   The majority of courts, including this Court, have determined that the sufficiency of a collateral description is a question of law, not of fact.   *See Monticello Banking Co. v. Flener*, 2010 WL 5158989, at *3 (W.D. Ky. Dec. 14, 2010) (collecting cases).

### A.      The Cooper Payments Are Properly Categorized as "Accounts."

"Accounts" is defined as a type of collateral under Kentucky's version of the UCC to mean "a right to payment of a monetary obligation, whether or not earned by performance . . . [f]or property that has been or is to be sold, leased, licensed, assigned,

or otherwise disposed of."   Ky. Rev. Stat. § 355.9-102(1)(b)(1)(a).   However, "accounts" does not mean "[r]ights to receive payment evidenced by chattel paper or an instrument."  *Id.* § 355.9-102(1)(b)(3)(a).  In this regard, "chattel paper" refers to "a record or records that evidence both a monetary obligation and a security interest," *id.* § 355.9-102(1)(k), and "instrument" refers to "a negotiable instrument or any other writing that evidences a right to the payment of a monetary obligation, is not itself a security agreement or lease, and is of a type that in ordinary course of business is transferred by delivery with any necessary indorsement or assignment," *id.* § 355.9-102(au).

Pursuant to the agreement executed on November 7, 2008, Catron agreed to sell his interest in certain limited liability companies, his stock in certain corporations, and certain interests in real estate in exchange for the Cooper Payments.  Under Kentucky law, a person's stock in a corporation or interest in a limited liability company is considered personal property.  *See* Ky. Rev. Stat. § 275.250.   In the language of Kentucky's UCC, Catron received "the right to payment of a monetary obligation . . . [f]or property that has been or is to be sold."   *See* Ky. Rev. Stat. § 355.9-102(1)(b)(1)(a).  The November 7 agreement is not "chattel paper" because it does not evidence a security interest.   Nor does that agreement meet the definition of an "instrument."   Accordingly, the Court finds that the Cooper payments are properly categorized as "accounts."

### B.   The 2007 Security Agreement Identified the Cooper Payments as Collateral.

The United States argues that the 2007 Financing Statement does not describe the Cooper Payments because the Cooper Payments did not come into existence until

November 2008 and because the 2007 Financing Statement's collateral description does not include an after-acquired property clause. To this end, the United States posits that the 2007 Financing Statement's mention of "accounts receivable" is insufficient to satisfy the "inquiry test" under Kentucky law. Therefore, the United States reasons that First National did not perfect any interest it might have had in the Cooper Payments via the 2007 Financing Statement. (*See* Docket No. 15, at 5-6.) The United States further argues that even if the financing statement need not contain an after-acquired property clause, the 2007 Security Agreement did not create an interest in after-acquired property because that agreement does not include an after-acquired property clause. (Docket No. 19, at 5.) The Court disagrees with each of these contentions.

1. **A financing statement need not necessarily contain an after-acquired property clause to perfect an interest in after-acquired property.**

The Court has found no controlling Kentucky authority on whether a financing statement must contain an after-acquired property clause to perfect a security interest in after-acquired accounts. However, the Kentucky General Assembly has stated that the "[o]fficial comments to the Uniform Commercial Code . . . represent the express legislative intent of the General Assembly and shall be used as a guide for interpretation of this chapter." Ky. Rev. Stat. § 355.1-103(3). In regard to after-acquired property, the official comments to UCC § 9-204 (which corresponds to Ky. Rev. Stat. § 355.9-204) advises:

> The effect of after-acquired property and future advance clauses as components of a security agreement should not be confused with the requirements applicable to financing statements under this Article's system of perfection by notice filing. The references to after-acquired property clauses and future advance clauses in this

> section are limited to security agreements. There is no need to refer
> to after-acquired property or future advances or other obligations
> secured in a financing statement.

UCC § 9-204 cmt. 7.  This commentary is consistent with the approach taken by a number of courts.  *See United States v. Cahall Bros.*, 674 F.2d 578, 581 (6th Cir. 1982) (applying Ohio law) ("The fact that the after-acquired property was not mentioned in [the] financing statement . . . is of no consequence since there is no need to refer to after-acquired property . . . in the financing statement."); *In re Taylor*, 45 B.R. 643, 645 (Bankr. M.D. Penn. 1985) (quoting the official commentary to UCC § 9-204 to conclude that "[t]here is no need to refer to after-acquired property . . . in the financing statement"); *In re Plad, Inc.*, 24 B.R. 676, 678 (Bankr. M.D. Tenn. 1982) ("The failure of the financing statement to refer to after-acquired inventory does not, however, render [a] security interest in such property unperfected.") *Sweney v. Cardinal Doors, Inc.*, 3 B.R. 103, 106  (Bankr. D. Idaho 1980) ("There is no statutory requirement that a financing statement contain an after-acquired property clause in order to perfect a security interest in such property.")  Though these authorities are not binding interpretations of Kentucky law, they nonetheless remain instructive.  To this end, Kentucky courts have recognized that although other jurisdictions' interpretations of the UCC are nonbinding, because "[a] primary purpose of the UCC is to foster a consistent commercial law among the different states . . . the Code's goal of consistency enhances that authority's persuasiveness."  *A & A Mech., Inc. v. Thermal Equip. Sales, Inc.*, 998 S.W.2d 505, 511 n.4 (Ky. Ct. App. 1999); *see also Star Bank, Kenton Cnty., Inc. v. Parnell*, 992 S.W.2d 189, 192 (Ky. Ct. App. 1998) ("Since one of the purposes of the UCC is 'to make uniform the law among the various jurisdictions', foreign cases which

discuss [the UCC] are persuasive." (quoting Ky. Rev. Stat. § 355.1-102(2)(c) (current version at § 355.1-103(1)(c)))); *Princesse D'Isenbourg Et Cie Ltd. v. Kinder Caviar, Inc.*, 2011 WL 720194, at *4 n.4 (E.D. Ky. Feb. 22, 2011) (recognizing that because the purpose of the UCC is uniformity, "non-Kentucky cases which interpret parallel UCC provisions are also persuasive"). Therefore, in accordance with the above-referenced Kentucky case- and statutory law, and with the persuasive authority of the approach taken by other jurisdictions that have confronted this question, the Court finds that a financing statement need not necessarily contain an after-acquired property clause to perfect an interest in after-acquired property.

> **2. The 2007 Security Agreement contains language sufficient to indicate First National's interest in Catron's after-acquired accounts.**

The 2007 Security Agreement states that Catron gives First National "a security interest in all of the Property described in this agreement that [Catron] owns or has sufficient rights in which to transfer an interest, *now or in the future*, wherever the Property is or will be located." (Docket No. 11-3.) The United States would read the phrase "now or in the future" as "merely . . . a test to determine property ownership" and limited to property owned on June 27, 2007, that Catron was then "able to transfer an interest either presently or in the future." (Docket No. 19, at 6.) The Court disagrees with this reading. As mandated by Ky. Rev. Stat. § 355.1-103(1), the UCC "shall be liberally construed and applied." Section 355.9-204 sets forth no requirement for particular language in order to create an interest in after-acquired collateral. Therefore, while the traditional "hereafter acquired" language is not present, the language that is present clearly indicates that future assets were intended to be secured. For this reason

and those discussed *infra* Part I.B.3, the Court is satisfied that this language was sufficient to provide notice of First National's interest in Catron's after-acquired accounts.[3] *See In re Taylor*, 45 B.R. at 645 ("Once notice is provided as to the type of the collateral in the financing statement there is duty to make inquiry of the secured party's agreement in order to determine the extent of the security interest.").

### 3. The 2007 Security Agreement and 2007 Financing Statement satisfy the inquiry test under Kentucky law.

Under Kentucky law, "a description of collateral is sufficient for either a security agreement or a financing statement if it puts subsequent creditors on notice so that, aided by inquiry, they may reasonably identify the collateral involved." *Nolin Prod. Credit Ass'n v. Canmer Deposit Bank*, 726 S.W.2d 693, 697 (Ky. Ct. App. 1986). Kentucky courts refer to this as the "inquiry test," the purpose of which "is simply to place subsequent creditors on notice to make inquiry as to the extent of a prior secured creditor's interest in the debtor's property." *Id.* at 700 (referencing *In re Drane*, 202 F. Supp. 221 (W.D. Ky. 1962)). Thus, in practice, the collateral description need only be specific enough to put an inquirer on notice that further inquiry may be required. *See,*

---

[3] This conclusion also comports with the reasoning of the Kansas Court of Appeals in *United Coops. v. Libel Oil Co., Inc.*, 699 P.2d 1040 (Kan. Ct. App. 1985). The security agreement there did include the language "now owned or hereafter acquired." *Id.* at 1041. However, in addressing whether an after-acquired property clause was required in a financing statement, the court reasoned: "Accounts receivable by their very nature change from day to day. A description of collateral which includes 'accounts receivable' is a sufficient 'red flag' warning to third parties to perfect a security interest in after-acquired accounts receivable." *Id.* at 1043. Thus, not only did the 2007 Security Agreement expressly describe First National's security interest as accounts that Catron "owns . . . now or in the future," the 2007 Financing Statement described the collateral as "accounts receivable," which *United Coops.* suggests would be sufficient to notify inquirers of First National's interest in Catron's after-acquired accounts. *See also In re Taylor*, 45 B.R. at 645 ("Once notice is provided as to the type of the collateral in the financing statement there is duty to make inquiry of the secured party's agreement in order to determine the extent of the security interest.").

*e.g.*, *Laurel Explosives, Inc. v. First Nat'l Bank & Trust Co.*, 801 S.W.2d 336, 338 (Ky. Ct. App. 1990).

The United States argues that the "2007 Financing Statement's mention of 'accounts receivable' does not satisfy the inquiry test." (Docket No. 19, at 6.) The United States reasons that because neither the 2007 Financing Statement nor the 2007 Security Agreement specifically mentions the Cooper Payments, "[a]n inquiring third party, even if they were able to obtain the commercial security agreement, would not be able to identify the Cooper Payments." (Docket No. 19, at 7.) The Court disagrees.

The Kentucky UCC provides that "[a] financing statement sufficiently indicates the collateral that it covers if the financing statement provides: . . . [a] description of the collateral pursuant to [§] 355.9-108." Ky. Rev. Stat. § 355.9-504. As discussed above, § 355.9-108 states that a description of collateral reasonably identifies the collateral if it identifies the collateral by category. In this vein, "[a] financing statement substantially satisfying the requirements of this part of this article is effective, even if it has minor errors or omissions, unless the errors or omissions make the financing statement seriously misleading." *Id.* § 355.9-506(1). Having found that the Cooper Payments are properly categorized as "accounts," that the 2007 Security Agreement specifically identifies the collateral as "Accounts and Other Rights to Payment," and that the 2007 Security Agreement sufficiently indicates that it covers after-acquired accounts, the Court is thus satisfied that the 2007 Financing Statement's description of "ALL . . . ACCOUNTS RECEIVABLE" sufficiently identifies the Cooper Payments for purposes of Kentucky's inquiry test. Applying that test here, the Court concludes that this description amounts to "a sufficient 'red flag' warning to third parties," *see United*

*Coops.*, 699 P.2d at 1043, and that, upon proper investigation, the IRS could have reasonably identified the collateral in which First National had previously taken a security interest.

C.   **The 2007 Security Agreement Was Perfected as to the Cooper Payments When That Account Came into Existence on November 7, 2008.**

First National's security interest attached to the Cooper Payments on November 7, 2008.  As noted above, a security interest becomes enforceable against the debtor and third parties with respect to the collateral—*i.e.*, attaches—when (1) value has been given, (2) the debtor has rights in the collateral or the power to transfer rights in the collateral to a secured party, and (3) the debtor has authenticated a security agreement that provides a description of the collateral.  Ky. Rev. Stat. § 355.9-203(2).  Here, value was given because the 2007 Security Agreement expressly "secure[d] all sums advanced" by First National.  (Docket No. 11-3.)  Catron first had rights in the Cooper Payments upon the execution of the November 7 agreement with Cooper to sell certain interests and property in exchange for the Cooper Payments.  The 2007 Security Agreement provided a description of the collateral, and Catron authenticated that agreement by his signature.  (*See* Docket No. 11-3.)  Therefore, because the 2007 Financing Statement had already been filed, the 2007 Security Agreement was perfected—and, the Court believes, choate for purposes of federal law—as to the Cooper Payments on November 7, 2008, when that account came into existence and the security agreement attached to that account.  *See McDermott*, 507 U.S. at 451-52 ("Under the Uniform Commercial Code, for example, a security interest in after-acquired property is generally not considered perfected when the financing statement is

filed, but only when the security interest has attached to particular property upon the debtor's acquisition of that property."); *Dishman*, 46 F.3d at 526 (holding that, for purposes of federal law and priority relative to a federal tax lien, a state lien is choate when the identity of the lienor, the property subject to the lien, and the amount of the lien are established).

## II.  Priority

As noted above, priority between a federal tax lien and a state law lien is "a question of federal law determined by the principle of 'the first in time is the first in right.'"  *Dishman*, 46 F.3d at 526.  Thus, the first lien perfected has priority over subsequent liens.  A federal tax lien arises at the time the assessment is imposed under 26 U.S.C. § 6321; however, under § 6323(a), such a lien is not valid against any holder of a security interest until the IRS files notice of its federal tax lien in accordance with § 6323(f)'s state-law filing and recordation requirements.  *See generally Redondo Constr. Corp. v. United States*, 157 F.3d 1060, 1062 (6th Cir. 1998) ("[A] properly filed federal tax lien has priority over a competing state-created lien unless the competing lien has 'attached' to the property in question and is 'choate' prior to the perfection of the federal tax lien.").  To perfect a tax lien in Kentucky, notice must be recorded "in the office of the county clerk of each county within which the property subject to the lien is located." Ky. Rev. Stat. § 382.480(1).  Therefore, a private security interest has priority over a federal tax lien only if it attached to the property in question and was perfected prior to the filing of notice of the federal tax lien.

For the reasons discussed above, the 2007 Security Agreement was perfected as to the Cooper Payments on November 7, 2008.  The 2006 Tax Lien was perfected when

the IRS filed notice of that lien in the Russell County Clerk's Office on April 14, 2008, thereby satisfying the requirements of 26 U.S.C. § 6323 and Ky. Rev. Stat. § 382.480(1).  Therefore, because the 2006 Tax Lien was perfected before the 2007 Security Agreement, the 2006 Tax Lien has priority vis-à-vis the 2007 Security Agreement.[4]  However, the 2007 Tax Lien was not perfected until the IRS filed notice in regard to that lien on October 16, 2009.  Thus, because the 2007 Tax Lien was perfected subsequent to the 2007 Security Agreement, the 2007 Security Agreement has priority over the 2007 Tax Lien.[5]

The resolution of this matter, however, is complicated by the circumstances under which the Cooper Payments were levied and the release of the 2006 Tax Lien. Those circumstances can be summarized as follows: (1) the IRS levied the first four Cooper Payments pursuant to the 2006 Tax Lien; (2) after the fourth Cooper Payment was levied, the IRS released the 2006 Tax Lien upon processing Catron's amended return; (3) the IRS then reallocated those funds that had been levied pursuant to the 2006 Tax Lien to the 2007 Tax Lien; and (4) thereafter, the IRS levied the final five Cooper Payments and applied those funds directly to the 2007 Tax Lien.

### A.   The Release of the 2006 Tax Lien Does Not Render the Levies Pursuant to that Lien Improper or Prevent the IRS from Crediting the Levied Funds to the 2007 Tax Lien.

First National does not appear to argue that the levies were procedurally improper or to dispute Catron's tax liabilities.  Instead, First National insists that it was

---

[4] First National does not contest this conclusion.  (*See* Docket No. 18, at 22 n.3.)

[5] Although the parties have thoroughly briefed the issues of attachment and perfection relative to the 2009 Security Agreement and 2009 Financing Statement, the Court has limited its discussion to the 2007 Security Agreement because the Court finds that agreement dispositive as to the priority issues here.

improper for the IRS to reallocate funds to the 2007 Tax Lien that were levied pursuant to the 2006 Tax Lien because, in doing so, the IRS improperly usurped First National's priority relative to the 2007 Tax Lien.  In support, First National relies principally on the Eighth Circuit's decision in *Bremen Bank & Trust Co. v. United States*, 131 F.3d 1259 (8th Cir. 1997).

*Bremen Bank* is largely on point with the facts of this case.  In *Bremen Bank*, a bank brought a wrongful levy action against the United States seeking the return of funds levied pursuant to a federal tax lien against a debtor-taxpayer despite the bank's superior perfected interest.  There, the IRS levied sums of money pursuant to two federal tax liens, the first perfected on July 6, 1993, and the second on May 2, 1994.  *Id.* at 1267.  The bank's interest in the levied sums was inferior to the earlier lien but superior to the later lien.  In this regard:

> [T]he IRS conceded [that] its allocation to the May 2, 1994, tax lien of some $100,695.74 of the total $180,762.43 produced by the various notices of levy was wrongful as to the Bank because that $100,695.74 was applied to tax periods for which the IRS had not yet filed a notice of tax lien, and for the reason that the Bank had a prior security interest in the monies.

*Id.*  However, the IRS refused to return the remaining sums, "claim[ing] it was free to reallocate the money and retain up to the properly levied amount ($80,066.69) from any of its levy collections."  *Id.*  The Eighth Circuit disagreed with the IRS's position and held that "the IRS cannot reallocate money levied to one of a series of liens in order to defeat the priority of a competing lienholder."  *Id.* at 1268.  The court explained its reasoning as follows:

> We disagree with the IRS's assertion that it has unfettered discretion to reallocate funds levied to two or more liens when that

> allocation works to the detriment of a competing prior lienholder or secured creditor. To allow the government to do so would be to eviscerate the principle of first in time, first in right. *See U.S. v. Pollack*, 370 F.2d 79, 81 (2d Cir. 1966) ( "[I]n the context of a series of government liens, . . . an application of the first in time, first in right rule prevents the government from using the security of a prior lien to satisfy subsequent liens to the detriment of an intervening or competing creditor whose security is superior to that of the government with respect to its junior liens.").

*Id.* The court went on:

> We would consider it strange indeed if the Congress intended for the Courts to be bound by the principle, "the first in time is the first in right," but intended for the collection officials of the Government to be left free to disregard that principle. We do not attribute any such intent to Congress, and hold that the principle just mentioned is as binding upon the collection officials as it is upon the courts.

*Id.* (quoting *Commercial Credit Corp. v. Schwartz*, 130 F. Supp. 524, 530 (E.D. Ark. 1955)).

Having found no controlling authority on this issue, the *Bremen Bank* decision is certainly persuasive here.  Based on that decision, it would appear that the IRS may not levy funds pursuant to one tax lien and then reallocate those funds to another tax lien, when doing so would defeat the priority of competing secured party.  Thus, *Bremen Bank* suggests that it was improper for the IRS to reallocate funds levied pursuant to the 2006 Tax Lien to satisfy the 2007 Tax Lien where the latter lien was inferior to First National's secured interest in those funds.

Still, the United States urges otherwise and insists that "under 26 U.S.C. § 6402(a), the IRS has the authority to credit the amount of any overpayment against any liability in respect of an internal revenue tax on the part of the person who made the

overpayment." [6] (Docket No. 19, at 12.) Indeed, § 6402(a) appears to authorize the IRS to credit any overpayment against any outstanding tax liability on the part of the person who made the overpayment. It follows that when the 2006 Tax Lien was released, the sums levied prior to that release became an overpayment, which, under § 6402(a), the IRS was then permitted to credit against Catron's other outstanding tax liability. This statute was not considered or addressed by the court in *Bremen Bank*.

Thus, the Court faces something of a quandary. On the one hand, the clear language of § 6402(a) seems to allow the IRS to reallocate overpayments to other outstanding tax liabilities. On the other, to permit such reallocation here would, in effect, allow the IRS to defeat First National's first-in-time priority. Although the Court finds *Bremen Bank* well-reasoned and persuasive, in the absence of controlling authority on this issue, the Court is compelled to follow the language of the statute and, thus, reach a different outcome here. Because the first four Cooper Payments were properly levied pursuant to the 2006 Tax Lien, and because 26 U.S.C. § 6402(a) permits the IRS to credit "*any* overpayment . . . against *any* liability in respect of an internal revenue tax," the Court cannot conclude that it was improper for the IRS to credit the amount of those first four levies of the Cooper Payments against the 2007 Tax Lien. For these reasons, the Court will grant summary judgment in favor of the United States as to the

---

[6] The United States presents two additional arguments as well. First, the United States reiterates its position that First National did not have a perfected interest in the Cooper Payments prior to perfection of the 2007 Tax Lien. For the reasons discussed *supra* Part I, the Court finds this argument without merit. Second, the United States argues that although the notice of federal tax lien relative to the 2007 Tax Lien was not filed until October 16, 2009, under Ky. Rev. Stat. § 355.9-313, the IRS "already had a perfected interest in the previously levied amounts because it maintained possession." (Docket No. 19, at 12.) But § 355.9-313 merely provides for perfection by possession; it does not alter the fact that First National's interest had already been perfected well before the first Cooper Payment was levied. Regardless, the Court finds neither of these arguments dispositive in resolving the parties' instant Motions.

first four levies of the Cooper Payments (October 8, November 19, and December 13, 2010, and January 12, 2011).

    **B.**    **The Levies Pursuant to the 2007 Tax Lien and After the 2006 Tax Lien Was Released Improperly Defeated First National's Superior Interest.**

Because the 2006 Tax Lien was released on January 21, 2011, the final five levies of the Cooper Payments, beginning February 14, 2011, necessarily were made pursuant to the 2007 Tax Lien. The United States concedes as much. (*See* Docket No. 12-1, at 7 ("While the issue of lien priority regarding the first four levied payments is easily discernible, priority regarding the remaining levied payments depends on the priority of the Government's 2007 tax lien.").) For the reasons discussed above, the 2007 Security Agreement was perfected as to the Cooper Payments on November 7, 2008, when the security agreement attached to that account. The 2007 Tax Lien, however, was not perfected until October 16, 2009, more than eleven months later. Therefore, First National's interest was superior to the IRS's. Accordingly, the Court finds that the final five levies of the Cooper Payments made pursuant to the 2007 Tax Lien (February 14, March 14, April 11, May 11, and June 10, 2011) were improper, and, therefore, the Court will grant summary judgment in favor of First National on its wrongful levy claim relative to those levies.

CONCLUSION

For the foregoing reasons, the Court will GRANT IN PART and DENY IN PART the parties' respective Motions for Summary Judgment.  Summary judgment will be granted in the United States' favor relative to the levies of the first four Cooper Payments, which occurred on October 8, 2010, November 19, 2010, December 13, 2010, and January 12, 2011, each in the amount of $22,222.22.  Summary judgment will be granted in First National's favor on its wrongful levy claim relative to the final five levies of the Cooper Payments, which occurred on February 14, 2011 ($22,222.22), March 14, 2011 ($22,222.22), April 11, 2011 ($22,222.22), May 11, 2011 ($22,222.22), and June 10, 2011 ($14,173.10), and First National shall be entitled to judgment in its favor in the total amount of $103,061.98.  A separate order of final judgment will issue separately with this Opinion.

Date:


cc:      Counsel
         AUSA